UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KYLE WATKINS,                          *
                                       *
            Plaintiff,                 *
                                       *
      v.                               *
                                       *      Civil Action No. 16-cv-10891-ADB
SEAN MEDEIROS,                         *
                                       *
            Defendant.                 *
                                       *
                                       *

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

      On June 2, 2005, following a jury trial in the Bristol County Superior Court, Petitioner

Kyle Watkins ("Petitioner") was convicted of murder in the first degree in violation of Mass.

Gen. Laws ch. 265, § 1 and unlawful possession of a firearm in violation of Mass. Gen. Laws

ch. 269, § 10(b).  Petitioner was sentenced to life in prison for the murder conviction with a

concurrent term of four to five years on the firearm conviction.

      Before the Court is Petitioner's petition for a writ of habeas corpus, pursuant to 28 U.S.C.

§ 2254 ("the Petition").  [ECF No. 1].  Petitioner raises a number of constitutional arguments in

support of the Petition and alleges that the decision of the Massachusetts Supreme Judicial Court

("SJC") affirming his conviction was unreasonable and contrary to clearly established federal

law and based on unreasonable determinations of facts.  For the reasons stated herein, the

Petition, [ECF No. 1], is <u>DENIED</u>.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

      In <u>Commonwealth v. Watkins</u>, 41 N.E.3d 10 (Mass. 2015), the SJC described the facts of

this case, which are summarized in relevant part below and "supplemented with other record

facts consistent with the SJC's findings." Yeboah-Sefah v. Ficco, 556 F.3d 53, 62 (1st Cir. 2009) (quoting Healy v. Spencer, 453 F.3d 21, 22 (1st Cir. 2006)).[1]

Petitioner spent the evening of April 25, 2003, at the New Bedford Elks Lodge, a private club located on Mill Street in New Bedford, Massachusetts. [Respondent's Supplemental Answer ("S.A.") Vol. I at 121]. Vernon Rudolph ("Rudolph"), a long-time friend of both Petitioner and Paul Coombs ("the victim"), was also present at the club that night. Watkins, 41 N.E.3d at 15. According to Rudolph, Petitioner spent a portion of the evening arguing loudly with the victim over the phone. [S.A. Vol. I at 121]. After Petitioner ended the call, Rudolph looked out of a window in the club and noticed that the victim was standing on the sidewalk outside of the club "frisking" people who attempted to enter. [Id.]; Watkins, 41 N.E.3d at 15. Rudolph suggested to Petitioner that he should go outside and fight the victim, but Petitioner refused and stayed at the club until after the victim had left. [S.A. Vol. I at 121]; Watkins, 41 N.E.3d at 15. The next morning, the victim told his girlfriend that he wanted to fight Petitioner, saying he would like to "whoop" him. Watkins, 41 N.E.3d at 15.

On April 26, 2003, the day of the shooting, Petitioner was seen at the Elks Lodge at least twice, first by the club's bartender and then by Rudolph. The bartender spotted Petitioner in the bathroom between 2:30 and 3:30 PM and testified that he looked upset and said he was "tired of people [messing] with him." Watkins, 41 N.E.3d at 15 (alteration in original). Rudolph saw Petitioner after he returned to the club sometime after 8:30 p.m. [S.A. Vol. I at 121]. At the time Rudolph saw him, Petitioner was wearing a black hoodie, black jeans, white and black sneakers, and batting gloves. Watkins, 41 N.E.3d at 16. Rudolph reported that Petitioner's attitude was

---

[1] In a habeas case, state court "factual findings are entitled to a presumption of correctness that can be rebutted only by clear and convincing evidence to the contrary." Rashad v. Walsh, 300 F.3d 27, 35 (1st Cir. 2002) (internal quotations omitted).

noticeably changed from his dejected appearance the day before, that he was acting "tough" and was overheard saying, "things are going to change around here." Id. at 15; [S.A. Vol. I at 121]. Petitioner left the club sometime around 9:30 p.m. [S.A. Vol I. at 143]. At about 9:50 p.m., the victim abruptly ended a phone call with his girlfriend after calling out, "Why don't you fight me now?" to an unidentified individual. Watkins, 41 N.E.3d at 16. He was shot shortly thereafter.

Mill Street, on which the victim was standing at the time of the shooting, runs perpendicular to Cedar Street, which is a one-way street. [ECF No. 24-3 at 42–43, 75–76]. There is a stop sign on Cedar Street at the intersection of the two streets. See [id.; id. at 20, 108]. Four witnesses—Ernestina Soares ("Ernestina"), Beatriz Soares ("Beatriz"), Michael Couture ("Couture"), and Rudolph—testified that they drove through this intersection at around 9:50 p.m. on April 26, 2003, and either heard the incident or saw a young African-American man shoot the victim.[2] Watkins, 41 N.E.3d at 16–17. All four witnesses also said that when they approached the intersection, they noticed a blue Lincoln Mark VIII automobile stopped on Mill Street. Id. This car was later connected to Petitioner when police learned that he had asked a friend to register the car in the friend's name but paid for the costs of registering and insuring the car himself. Id. at 17 n.5.

Ernestina and Beatriz reported that after they turned left onto Mill Street, they drove past the victim and saw him standing on the left side of the street, next to a parked Honda Accord with its driver's side door open. [S.A. Vol. I at 149]. The victim appeared to be involved in a verbal altercation with a man who was standing on the opposite side of the street. Watkins, 41 N.E.3d at 16. Both Ernestina and Beatriz described this second man as African American,

---

[2] The women are being identified by their first names because they share the same last name.

approximately six feet tall, well-built, and wearing dark clothing including a hooded sweatshirt.[3]
Id. at 16 n.4.  Ernestina and Beatriz reported that the victim cried out to this man, "Don't [mess]
with me.  I'm not the one to be [messed] with."  Id. at 16 (alteration in original).  After they
drove past the men and the Honda, Ernestina saw the second man walk towards the Honda and
raise his hand.  Id.  Moments later, both sisters heard gunshots.  Id.  The pair drove away from
the scene and called 911.  Id.

At about the same time, Couture, who was driving on Cedar Street, crossed through the
intersection of Cedar and Mill Streets.  Watkins, 41 N.E.3d at 16.  While in the middle of the
intersection, he heard a loud noise to his left and saw a flash out of the corner of his eye.  [S.A.
Vol. I at 144].  He reported that the entire event lasted only a few seconds, but that he saw an
African-American man between six feet and six feet two inches tall with a slim to medium build,
dressed in dark clothing, wearing either a mask, hat, or hood, fire multiple shots into the parked
Honda Accord.  Watkins, 41 N.E.3d at 16.  Couture saw the shooter flee the scene, [S.A. Vol. I
at 144], and then reversed his car down Cedar and turned left onto Mill Street in order to pull up
alongside the Honda Accord that had been parked on Mill Street, [id.].  Upon seeing the victim
inside the car, he called 911.  [Id.].

Also at about this same time, Rudolph approached the intersection of Cedar Street and
Mill Street while driving down Mill Street and had to swerve to avoid the parked Lincoln Mark
VIII.  Watkins, 41 N.E.3d at 16.  He noticed Petitioner standing next to a parked vehicle on the

---

[3] "Beatriz described the man as being African-American, about six feet tall, 220 or 230 pounds,
well built, either bald or with a receding hairline, and dressed in dark clothing, including a
hooded sweatshirt. Ernestina described the man as being a light-skinned African-American,
possibly Spanish or Cape Verdean, between six feet and six feet two inches tall, 220 or 240
pounds, well built, bald, and dressed in dark clothing, including a hooded sweatshirt." Watkins,
41 N.E.3d at 16 n.4.

opposite side of the intersection with Cedar Street, wearing the same clothing he had seen him wearing earlier that evening.  Id.  Rudolph indicated that he was able to identify Petitioner from afar based on his clothing, his mannerisms, and a glimpse he caught of Petitioner's face when his hood slipped backwards as he fired seven to eight shots at the parked vehicle.[4]  Id. at 16–17.  Rudolph drove directly from the crime scene to his mother's house, where he told her that he had just witnessed a shooting, although he did not immediately share the shooter's identity with her.  Id. at 17.

Officer Bryan Safioleas of the New Bedford Police Department was the first to arrive at the crime scene.  Watkins, 41 N.E.3d at 17.  Just before the shooting, he had been stationed in the area and had noticed a Lincoln Mark VIII, possibly the one connected to Petitioner, drive around the block "a 'couple' of times."  Id.  Officer Safioleas found the victim seated in the Honda Accord, unconscious and bleeding from multiple gunshot wounds.  Id.  Emergency medical technicians arrived and transported the victim to a nearby hospital, where he was declared dead.  Id.  Police identified Petitioner as a suspect in the days after the shooting but were unable to locate him for several months.  Id.  It was during this time that police discovered that Petitioner had paid to register and insure the Lincoln Mark VIII car but had asked a friend to register it in her name.  Id. at 17 n.5.  Two sources, including Petitioner's girlfriend, indicated that they had seen Petitioner in the car in the past, and one had a photo of the vehicle parked in the driveway of Petitioner's girlfriend.  Id.

State troopers located and arrested Petitioner nearly three months after the shooting, on August 3, 2003, when they spotted him entering a restaurant in Lynn, Massachusetts.  Watkins,

---

[4] According to Rudolph, the shooter "bounce[d]" in a way that he knew to be characteristic of Petitioner.  Watkins, 41 N.E.3d at 16–17.

41 N.E.3d at 17.  When approached by the state troopers, Petitioner initially gave them a fake name and fake driver's license.  Id.  A New Bedford police officer who knew Petitioner transported him back to New Bedford and observed that Petitioner was "unshaven and sweating, wearing a dirty white t-shirt and baggy jeans, and appeared to have lost a lot of weight."  [S.A. Vol. I at 220].  A state trooper who was also in the car during Petitioner's transport back to New Bedford remarked to Petitioner that he looked "bad," to which Petitioner replied that he was under a lot of stress.  Watkins, 41 N.E.3d at 17.  Petitioner told the trooper that he was enjoying the car ride because it was "going to be the last ride he was going to have for a long time."  Id.

Petitioner was charged with murder and a firearm violation in September 2003, [S.A. Vol. I at 30], and tried in front of a jury from May 24 to June 2, 2005, [id. at 3; ECF No. 38 at 4]. The jury returned a guilty verdict, and Petitioner was sentenced to a term of natural life for homicide and a concurrent term of four to five years for unlawful possession of a firearm.  [S.A. Vol. I at 6; ECF No. 24-8 at 7].  Petitioner then moved for entry of a verdict of not guilty pursuant to Massachusetts Rule of Criminal Procedure 25(b)(2), or in the alternative, a new trial pursuant to Massachusetts Rule of Criminal Procedure 30(b) ("MNT").  [S.A. Vol. II at 313].  In August 2012, the Superior Court held a four-day evidentiary hearing on the MNT, during which most of the Commonwealth's trial witnesses and a number of additional witnesses that had not been part of the original trial testified.  Watkins, 41 N.E.3d at 18 n.6; [S.A. Vol. I at 12].  The MNT was denied, [S.A. Vol. I at 105], and Petitioner appealed the denial and his conviction to the SJC, [S.A. Vol. I at 19].  The SJC affirmed both, Watkins, 41 N.E.3d at 28, and on May 16, 2016, Petitioner filed the instant Petition, [ECF No. 1].

## II.    LEGAL STANDARD

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), when a claim has previously been adjudicated on the merits by a state court, a petitioner may only obtain habeas relief if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established Supreme Court precedent if: "(1) the state court arrives at a conclusion opposite that reached by [the Supreme Court] on a question of law"; or (2) the state court decides a case differently from a decision of the Supreme Court on a materially indistinguishable set of facts. Williams v. Taylor, 529 U.S. 362, 405, 413 (2000). A state court unreasonably applies federal law when it "correctly identifies the governing legal principles, but (i) applies those principles to the facts of the case in an objectively unreasonable manner; (ii) unreasonably extends clearly established legal principles to a new context where they should not apply; or (iii) unreasonably refuses to extend established principles to a new context where they should apply." Gomes v. Brady, 564 F.3d 532, 537 (1st Cir. 2009) (citation omitted). An unreasonable application requires "some increment of incorrectness beyond error." Norton v. Spencer, 351 F.3d 1, 8 (1st Cir. 2003) (citation omitted). A petitioner must show that the state court decision applied clearly established law in a way that was "objectively unreasonable." Sanchez v. Roden, 753 F.3d 279, 299 (1st Cir. 2014) (citation omitted).

Thus, to obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error

well understood and comprehended in existing law beyond any possibility for fair minded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). "The petitioner carries the burden of proof." Cullen v. Pinholster, 563 U.S. 170, 181 (2011). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991). Furthermore, "[e]rrors based on violations of state law are not within the reach of federal habeas petitions unless there is a federal constitutional claim raised." Kater v. Maloney, 459 F.3d 56, 61 (1st Cir. 2006) (citing Estelle, 502 U.S. at 67–68). "'[T]he gap between erroneous state court decisions and unreasonable ones is narrow,' and 'it will be the rare case that will fall into this gap.'" O'Laughlin v. O'Brien, 568 F.3d 287, 299 (1st Cir. 2009) (first quoting Evans v. Thompson, 518 F.3d 1, 6 (1st Cir. 2008), then quoting Williams, 529 U.S. at 388).

A federal court cannot grant habeas relief to a state prisoner unless the prisoner has first exhausted his federal constitutional claims in state court. 28 U.S.C. § 2254(b)(1)(A). "[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999). A claim for habeas relief is exhausted if it has been "fairly and recognizably" presented in state court. Sanchez, 753 F.3d at 294 (quoting Casella v. Clemons, 207 F.3d 18, 20 (1st Cir. 2000)). In other words, "a petitioner must have tendered his federal claim [in state court] in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question." Id. (internal quotation marks and citations omitted).

## III.    DISCUSSION

Petitioner raises seven bases for relief, which are consolidated into four grounds in his memorandum in support of the Petition. [ECF No. 28]. Petitioner argues that decisions of the

SJC and the findings of the MNT judge were based on objectively unreasonable applications of Supreme Court law and unreasonable determinations of fact with respect to (1) evidence withheld by the Commonwealth before trial ("Ground One"), (2) alleged instances of prosecutorial misconduct ("Ground Two"), (3) alleged instances of ineffective assistance of counsel ("Ground Three"), and (4) the sufficiency of the evidence against Petitioner ("Ground Four"). [ECF No. 1 at 12–20]. In support of these claims, Petitioner raises many of the same arguments he presented to the state courts and argues that decisions contrary to his legal arguments were unreasonable given the strength of these arguments. Respondent Sean Medeiros ("Respondent") opposes the Petition and asserts that habeas relief should be denied because each of Petitioner's claims were properly decided by the SJC. [ECF No. 38 at 4].

A.    **Ground One: <u>Brady</u> Violations**

In Ground One of the Petition, Petitioner claims that the SJC's "decision with respect to the Petitioner's <u>Brady</u> issues was an unreasonable application of clearly established Supreme Court law, and it was based on multiple unreasonable determinations of facts in light of the evidence presented." [ECF No. 28 at 18]. In support of this claim, Petitioner alleges that the Commonwealth withheld evidence of Rudolph's prior contacts with the police and current cooperation with the government, a crime scene diagram, and notes taken by the police during their interrogation of Rudolph in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). [ECF No. 28 at 19, 32, 35, 39]. While the SJC agreed with Petitioner that this evidence had likely been withheld, it declined to conclude that there had been any <u>Brady</u> violation because Petitioner did not prove prejudice. <u>Watkins</u>, 41 N.E.3d at 20–23. Petitioner contends that this conclusion was

improper because the individual and cumulative value of the suppressed evidence was sufficiently prejudicial to rise to the level of a <u>Brady</u> violation.  [ECF No. 28 at 43].

1.    <u>Legal Standard</u>

Under <u>Brady</u>, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  The government has an affirmative duty to disclose such evidence even if the defense does not request it.  <u>Kyles v. Whitley</u>, 514 U.S. 419, 433 (1995).  To prevail on a <u>Brady</u> claim in a habeas petition, a petitioner must demonstrate: "(1) the evidence at issue is favorable to him because it is exculpatory or impeaching; (2) the Government suppressed the evidence; and (3) prejudice ensued from the suppression (i.e. the suppressed evidence was material to guilt or punishment)." <u>Conley v. United States</u>, 415 F.3d 183, 188 (1st Cir. 2005).  "[E]vidence is 'material' when a reasonable probability exists 'that the result of the trial would have been different if the suppressed documents had been disclosed to the defense.'"  <u>Id.</u> (citing <u>Strickler v. Greene</u>, 527 U.S. 263, 289 (2006)).

2.    <u>Rudolph's Prior Contacts with the Police</u>

Petitioner's defense team filed a number of pre-trial motions requesting exculpatory information from the Commonwealth regarding Rudolph's history of contacts or cooperation with the police or the government.  [ECF No. 28 at 19]; <u>see</u> [S.A. Vol. I at 4–5].  Petitioner argues that at least two such reports were withheld to his detriment, including (a) a report from Rudolph's dangerousness hearing for unrelated charges that indicates that Rudolph had requested special treatment in that matter in exchange for his testimony against Petitioner and (b) a police report from an incident where Rudolph had accidentally shot himself with an illegal firearm but

was not charged with a crime.  [ECF No. 28 at 25, 28].  Petitioner claims that the SJC

unreasonably applied Brady in concluding that no prejudice resulted from the withholding of this

evidence because, without access to these reports, he could not fully cross-examine Rudolph

about his potential bias.  [ECF No. 28 at 28].

### a.   Dangerousness Hearing

At the relevant dangerousness hearing for an unrelated drug and firearm charge, Rudolph

called out to the court, "So what happens when the murder case comes up?  Am I to come to

court bright eyed and bushy tailed and testify against somebody else after this?  That's not fair,

your Honor, it's not fair."  [S.A. Vol. II at 989].  Petitioner argued to the SJC that the report from

this hearing is evidence that Rudolph had requested a benefit in exchange for testifying against

him.  [S.A. Vol. I at 44–45].  The SJC agreed, but found that Petitioner did not suffer any

prejudice from the non-disclosure of this report because "the agreement that Rudolph eventually

reached with the prosecutor, provided to [Petitioner], clearly informed [Petitioner] that Rudolph

had been seeking an incentive in return for his testimony."  Watkins, 41 N.E.3d at 21–22; see

[S.A. Vol. II at 510–11].  Given that Petitioner admits elsewhere in his brief that he received the

details of Rudolph's cooperation with the Commonwealth via fax two days before trial, [ECF

No. 28 at 39], his argument that the withholding of this report deprived him of this line of cross-

examination and caused him prejudice fails to meet the Brady standard.

### b.   Police Report of Accidental Shooting

In October 2003, Rudolph was hospitalized after accidentally shooting himself with what

Petitioner believes was an illegal firearm.  [S.A. Vol. II at 507]; see [ECF No. 28 at 28–31].

"The motion judge found that, 'while the evidence is far from conclusive,' the Commonwealth

most likely failed to provide the Petitioner with" the police report about this incident, but that

there was "no evidence that investigating officers were aware that Rudolph was a Commonwealth witness . . . ." Watkins, 41 N.E.3d at 22. The SJC held that the record supported the MNT judge's findings. Id.

Both parties agree that Rudolph informed the officers that he was a Commonwealth witness but disagree about the effect of the failure to provide Petitioner with the police report on a Brady calculus. See [ECF No. 28 at 29–31; ECF No. 38 at 16; S.A. Vol. I at 229–30]. Petitioner believes the report is material because it evidences a pattern of Rudolph seeking rewards for his testimony and that withholding the report was tantamount to depriving him of a powerful impeachment tool. [ECF No. 28 at 29–31]. Respondent supports the SJC's conclusion that Petitioner was not prejudiced by the suppression of the report "where Petitioner failed to show that Rudolph's anticipated testimony had any bearing on the decision not to prosecute him for shooting himself." [ECF No. 38 at 16].

The AEDPA provides that a state court's determinations of fact "shall be presumed to be correct" unless rebutted by a habeas petitioner by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). According to the report in question, Rudolph immediately disclosed his role as a witness against Petitioner to the responding officers:

> RUDOLPH stated that he had been receiving threats on his life since he became a witness in the murder investigation of one PAUL COOMBS. RUDOLPH witnessed the murder by firearm and gave statements to the police implicating one KYLE WATKINS. WATKINS was later apprehended and incarcerated.
>
> RUDOLPH originally stated that he parked his vehicle outside of the Elks Club at Cottage St. and Mill St. and was going to enter the club. He claimed that he saw a male wearing dark clothing approach and he became nervous. He tried to retreat to his car when this male produced a gun and pointed it at him. A brief struggle then ensued and the gun fired once striking him in the finger. Rudolph stated that he then ran northerly on Cottage St. and the male suspect ran in the other direction.
>
> After several minutes and more specific questioning he eventually admitted that he fabricated the story . . . .

> RUDOLPH stated that he had hoped to be treated and released without the hospital having to contact the police. He apologized for creating the story and for wasting our time, but he felt he had no choice. He stated that he has in fact been receiving threats from WATKINS' friends, but did not want to name anyone or document any of the incidents.

[S.A. Vol. II at 508]. The above excerpts from the October 29, 2003 police report constitute clear and convincing evidence that the MNT judge erred in finding, and the SJC erred in affirming, that the officers who investigated this incident did not know that Rudolph intended to serve as a witness against Petitioner. This error, however, does not entitle Petitioner to habeas relief.

In order to warrant habeas relief, a state court decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103. The SJC's conclusion that "the defendant suffered no prejudice as a result of the Commonwealth's failure to disclose this police report," Watkins, 41 N.E.3d at 22, remains justifiable in light of the details of this report. Petitioner believes this report shows that Rudolph should have been charged as a felon in possession of a firearm and argues that because Rudolph was not charged as such, Rudolph received a material benefit in exchange for his testimony against Petitioner. [ECF No. 28 at 31]. Petitioner asserts that more conclusive proof of such an agreement "would be impossible" but that "the facts, however, speak for themselves." [Id.]. The police report, however, does not support this claim. It shows no evidence that the responding officers considered charging Rudolph as a felon-in-possession and, correspondingly, no evidence that they decided not to do so as a benefit in exchange for Rudolph's testimony. See [S.A. Vol. II at 508]. In any event, Petitioner knew that Rudolph had received a benefit and had the opportunity to cross-examine

him on this subject. Therefore, contrary to Petitioner's assertion, the SJC properly determined that withholding this report was not prejudicial.

### 3. Crime Scene Diagram

Petitioner next argues that he should have received a copy of a diagram drawn of the crime scene on the night of the victim's death. [ECF No. 28 at 32]. The diagram was hand-drawn on lined paper by a responding officer and, according to the MNT judge, was intended to indicate the distance between shell casings found on Mill Street and the Honda Accord in which the victim was found.[5] [S.A. Vol. II at 1178–79; S.A. Vol. I at 146]. Petitioner believes that this crime scene diagram is valuable to his case because it contradicts Rudolph's testimony and "render[s] his identification of Watkins utterly impossible." [ECF No. 28 at 33]. As discussed supra in Section I, Rudolph testified that he saw Petitioner shoot the victim near the intersection of Mill and Cedar Streets, but all the other witnesses and the physical evidence indicated that the victim and his Honda Accord had been positioned closer to the middle of the block.

The MNT judge agreed that the crime scene diagram was wrongfully withheld but found that Petitioner could not prove that he had suffered prejudice. [S.A. Vol. I at 146]. The MNT judge determined that, contrary to Petitioner's assertions, the diagram could not be used to pinpoint the "exact location" where the victim's body was found because it was not drawn to scale. [Id.]. The SJC affirmed, reasoning that the diagram would have "served only as weak and cumulative impeachment evidence" if it had been introduced at trial. Watkins, 41 N.E.3d at 21.

---

[5] The diagram is a rough rendering of the Mill Street location where the Honda Accord and the victim were found. [S.A. Vol. II at 1178–79]. The Honda Accord is indicated by a small rectangle positioned on the left side of Mill Street, fourteen lines from the label "Cedar." Id. Several small dots indicate the approximate location where shell casings were found. Each dot is numbered or otherwise annotated. Id. A number of measurements are printed on the back side of the paper. Id. The diagram is not drawn to scale and it does not indicate the distance between the Honda Accord and the intersection. Id.

Both courts noted that the crime scene evidence was cumulative and not material because several witnesses and crime scene photographs were introduced to show the relative location of the Honda Accord to the intersection. [S.A. Vol. I at 146]; Watkins, 41 N.E.3d at 21.

Evidence is cumulative when it is "repetitive" or "only marginally relevant," and "[t]he unavailability of cumulative evidence does not deprive [a] defendant of due process." Crane v. Kentucky, 476 U.S. 683, 689 (quoting Delaware v. Van Arsdall, 475, U.S. 673, 679 (1986)); Conley, 415 F.3d at 188 (quoting Moreno-Morales v. United States, 334 F.3d 140, 147–48 (1st Cir. 2003)); see United States v. Sanchez, 917 F.2d 607, 618 (1st Cir. 1990). Several other witnesses specifically testified that they saw the victim's Honda Accord farther down Mill Street than indicated by Rudolph, see [ECF No. 24-3 at 64, 81–82, 110; ECF No. 24-4 at 77], and Petitioner's trial counsel highlighted this discrepancy in his closing statement, see [ECF No. 24-7 at 74]. The jury was also afforded the opportunity to view photographs of the crime scene and could have concluded that the location of the memorial to the victim appeared to contradict Rudolph's testimony. [S.A. Vol. I at 146]. In addition, as the MNT judge found, even conclusive evidence that the Honda Accord had been parked more towards the center of the block would not have negated Rudolph's testimony because he claimed he saw the victim's Honda Accord roll to the center of the block after the victim had been shot. [S.A. Vol. I at 147]; see Moore v. Illinois, 408 U.S. 786 (1972) (no Brady violation when undisclosed police diagram did not contradict witness testimony).

In light of the wealth of evidence on this same point, and the relatively low probative value of the crime scene diagram given that it was cumulative, Petitioner could not show that he suffered prejudice. The SJC's decision with respect to this evidence was, therefore, not unreasonable.

4. Notes from Interview with Rudolph

In his fourth Brady claim, Petitioner argues that it was unreasonable for the SJC to

conclude that notes taken by the New Bedford police officer who questioned Rudolph were not

material. [ECF No. 28 at 35]; see [S.A. Vol. II at 1379–82]. Petitioner argues here, as in his

brief to the SJC, that access to these notes would have changed the outcome of the

Commonwealth's motion *in limine* to preclude third-party culprit evidence regarding Barry

Souto ("Barry"). [ECF No. 28 at 38; S.A. Vol. I at 51–53]. The SJC held that "[t]he notes

would not have changed the judge's decision to allow the Commonwealth's motion to exclude

the proposed third-party culprit evidence, where there were no substantial connections linking

[the proposed third-party culprit] to the crime." Watkins, 41 N.E.3d at 23.

In the early 1990s, the victim was arrested, charged, and convicted of the manslaughter of

Zachary Souto ("Zachary"). See [S.A. Vol. II at 644]. When Rudolph spoke with police about

the victim's murder, he revealed that he had recently seen Zachary's brother Barry, who had

indicated that although he was afraid of the victim, Barry had not hired a hitman to kill him.

[S.A. Vol. I at 52]. Petitioner places great weight on the mention of a hitman and construes this

reference as evidence that Barry had considered killing the victim, which he argues constitutes

important third-party culprit information. [ECF No. 28 at 36]. Petitioner asks the Court to

narrow in on this reference, but the broader context of the notes cannot be ignored. The notes do

not suggest that Barry hired a hitman to kill the victim, rather they explicitly state that he did not.

[S.A. Vol. II at 1380 ("Barry told Vern he did not hire [a] hitman")]. The notes further indicate

that Barry had moved on from Zachary's killing and that he had spoken personally with the

victim to clear the air between them. [Id. ("Last spoke w/ V last month discussed Barry Souto +

V's history, Barry told Vern it was behind him re: Zach (few weeks ago) . . . Barry talked to Paul

– to clear it up . . . Barry scared of Paul Coombs" (emphasis in original))].  The notes do not

suggest that there was an ongoing feud between Barry and the victim, and they lend no support

to Petitioner's third-party culprit argument.  It is unlikely that this evidence would have changed

either the outcome of Petitioner's motion *in limine* or the outcome of his trial and, therefore, the

SJC's determination that Petitioner did not suffer any prejudice in this instance was neither

unreasonable in light of the facts nor in contravention of federal precedent.

5. <u>Rudolph's Agreement with the Commonwealth</u>

Rudolph was arrested and charged with three counts of drug trafficking related charges in

December of 2003.  <u>See</u> [S.A. Vol. II at 510–11].  He pled guilty to these charges and received a

combined sentence of three years and one day in a Massachusetts house of correction.  [<u>Id.</u>].  At

the time of Petitioner's trial in June of 2005, Rudolph had served eighteen months of this

sentence.  [<u>Id.</u>].  The Commonwealth agreed to re-sentence Rudolph to time served and to release

him in exchange for his testimony against Petitioner.  <u>See</u> [<u>id.</u>].  As a result, Rudolph was

released from incarceration on the same day that he testified at Petitioner's trial.  <u>See</u> [<u>id.</u>; ECF

No. 28 at 40–41].

Petitioner's claim that the Commonwealth purposefully concealed the extent of this

cooperation from Petitioner's trial counsel is counter-factual.  [ECF No. 28 at 39–40].  The state

prosecutor faxed a copy of the letter outlining the Commonwealth's agreement with Rudolph to

Petitioner's trial counsel two days before trial.  [S.A. Vol. II at 510–11].  Petitioner admits that

he received this fax but alleges that the fax did not notify him that Rudolph would be released so

soon after testifying.  [ECF No. 28 at 39].  According to this letter, the state prosecutor intended

to dismiss one of Rudolph's charges and to suspend the unserved portion of his sentence after he

testified against Petitioner.  [<u>Id.</u>].  "[T]he net effect of these motions, should they be allowed" the

17

letter reads, "will be to release Mr. Rudolph from further incarceration and place him under probation supervision for three years." [Id. at 39–40; S.A. Vol. II at 511]. The SJC's determination that "there was no basis upon which the defendant legitimately could claim surprise or failure to disclose when Rudolph was released on the day that he testified," is reasonable given this evidence. Watkins, 41 N.E.3d at 21.

Because the SJC's conclusions on each of Petitioner's Brady claims are supported by the record and comport with clearly established federal law, the Court does not find that the SJC's factual findings were erroneous or that its legal conclusions were an unreasonable application of federal law. Therefore, Petitioner is not entitled to relief on Ground One.

### B.     Ground Two: Prosecutorial Misconduct

In Ground Two of his Petition, Petitioner asserts that the state prosecutor violated his Fifth, Sixth, and Fourteenth Amendment rights and that the SJC's decision with respect to these claims was contrary to federal law under Donnelly v. DeChristoforo, 416 U.S. 637 (1974). [ECF No. 28 at 44].[6] Petitioner alleges that fraud on the court, improper presentation of crime scene evidence, improper closing statements, and an un-waivable conflict of interest, "so 'poisoned the well' as to be violative of [his] federal and state due process rights." [Id. (quoting United States v. Manning, 23 F.3d 570, 574 (1st Cir. 1994))]. Respondent broadly rejects these claims and asserts that none of the alleged prosecutorial errors amounted to a due process violation under state or federal law. [ECF No. 38 at 19].

---

[6] Although Petitioner claims a violation of his Sixth Amendment rights, he advances no arguments in support of this claim. See [ECF No. 28 at 44–69]. For this reason, the Court focuses on his Due Process allegations.

2.      Legal Standard

Prosecutorial conduct that infringes on a defendant's constitutional rights is plainly improper. In the event no particular constitutional right is implicated by a prosecutor's actions, his or her conduct can still amount to a constitutional violation when it "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." DeChristoforo, 416 U.S. at 643. "In other words, even if a prosecutor's misconduct does not infringe upon a specific constitutional right, it can still violate the Due Process Clause of the United States Constitution by rendering the underlying trial 'fundamentally unfair.'" Pagano v. Allard, 218 F. Supp. 2d 26, 33–34 (D. Mass. 2002) (citing Darden v. Wainwright, 477 U.S. 168, 182–83 (1986)).

3.      Closing Arguments

Not all "undesirable" or even "universally condemned" statements made by a prosecutor amount to a due process violation under DeChristoforo. Darden, 477 U.S. at 181. For example, when a habeas petitioner requests review of closing arguments made by a state court prosecutor, the statements must be more than merely false or prejudicial in order to justify the intervention of a federal court. See Pagano, 218 F. Supp. at 35–37. A court must consider whether a statement fundamentally impacted the trial such that it likely influenced a jury's guilty verdict. Darden, 477 U.S. at 182–83. In making this determination, a court should avoid "giving too much weight to stray remarks in the course of a closing argument" and should not assume "that the jury will interpret each and every statement in the most damaging manner possible." Dagley v. Russo, 540 F.3d 8, 17 (1st Cir. 2008). "Moreover, the appropriate standard for review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" Darden, 477 U.S. at 181 (quoting DeChristoforo, 416 U.S. at 637).

Before trial, the Superior Court judge allowed Petitioner's motion *in limine* to preclude the Commonwealth from introducing evidence that Rudolph had been threatened not to testify. [S.A. Vol. II at 485; ECF No. 38 at 22]. The motion was allowed, however, with the condition that Petitioner could not seek to impeach Rudolph with prior inconsistent statements. [ECF No. 38 at 22]. According to Petitioner, he refrained from introducing evidence of Rudolph's wavering and recanting, but the prosecutor nevertheless alluded to the threats Rudolph received in his closing argument when he suggested that Rudolph was going to be released from prison for his own protection.[7] [ECF No. 28 at 60]. Petitioner's defense counsel immediately objected to this insinuation, the Superior Court judge ordered the comment stricken from the record, and the jury was instructed to disregard the statement. Watkins, 41 N.E.3d at 25.

It is an "almost invariable assumption of the law that jurors follow their instructions . . . ." Richardson v. Marsh, 481 U.S. 200, 206 (1987). It is unlikely that this one comment, made in passing during closing argument and immediately struck, influenced the jury's decision to convict Petitioner. See Darden, 477 U.S. at 182–83.

Petitioner next argues that the jury's verdict was impacted in contravention of DeChristoforo by "pronounced and persistent" misrepresentations of the evidence made in the prosecutor's closing statements. [ECF No. 28 at 66–69 (quoting Berger v. United States, 295 U.S. 78, 89 (1935))]. The SJC "discern[ed] no reason to address" these remaining arguments about the impropriety of the prosecutor's closing statements because each argument was "considered and rejected by the [MNT] judge." Watkins, 41 N.E.3d at 24. The MNT judge carefully considered and rejected each of Petitioner's claims, holding that the prosecutor had

---

[7] "In explaining in his closing argument why he had supported [Rudolph's] release from prison, the prosecutor stated: 'Folks, what do you think Mr. Rudolph's life would be worth in prison after testifying?'" Watkins, 41 N.E.3d at 25.

properly stated the evidence, and where he had not, the trial court had stricken his misstatement from the record with a reminder to the jury that closing arguments are not evidence. [S.A. Vol. I at 155–61]. This Court agrees. Proper statements of the evidence and statements "followed by specific disapproving instructions" do not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process," DeChristoforo, 416 U.S. at 643. There is no evidence that the MNT judge's determinations were improper, and Petitioner does not prove that the SJC acted in contravention of DeChristoforo in adopting them.

4.    Rudolph's Testimony

Petitioner next claims that because of purported inaccuracies in Rudolph's testimony, the prosecutor knowingly presented false testimony when he called Rudolph to testify. [ECF No. 28 at 50]. The SJC held that even though "Rudolph's testimony was to some extent contradicted does not establish that it was false, or that the prosecutor knowingly and intentionally suborned false testimony . . . ." Watkins, 41 N.E.3d at 24–25. Petitioner claims throughout his brief that Rudolph's testimony regarding the Honda Accord's location made him an implausible and even impossible witness, but the SJC found that the testimony about the location of the car was not "significantly contradictory." Id. at 26. The SJC reasoned:

> Beatriz's testimony that the vehicle was a little farther up [Mill Street] than [where Rudolph indicated it had been] did not establish that Rudolph would have been unable to see the vehicle, and both he and a responding officer testified that they were able to see farther up the street, past the NAACP building and its parking lot beyond the fire hydrant.

Id.

Discrepancies in witness testimony do not constitute perjury, and prosecutors are not barred from calling witnesses who will present conflicting testimony. United States v. Casas, 425 F.3d 23, 45 (1st Cir. 2005); United States v. Doherty, 867 F.2d 47, 70 (1st Cir. 1989); see also United States v. Frazier, 429 Fed. App'x 730, 734 (10th Cir. 2011) ("Discrepancies in

testimony are common and can generally be explained as resulting from human failings short of intentional lying."). Admitting Rudolph's testimony did not "so infect" the trial with unfairness as to constitute a violation of Petitioner's due process rights under DeChristoforo. The SJC properly decided this claim, and its factual determinations are supported by the record.

> 5. Rudolph's Agreement with the Commonwealth

Rudolph's December 2003 sentence included one count of distributing cocaine within 1,000 feet of a school, which was dropped as part of his cooperation agreement with the Commonwealth. See [S.A. Vol. II at 510–13; S.A. Vol. I at 120]. Petitioner suggests the Commonwealth dropped this charge intentionally and fraudulently in order to immediately release Rudolph in return for his testimony against Petitioner. [ECF No. 28 at 45]. The school-zone charge carried a mandatory minimum sentence of two years, of which Rudolph had only served eighteen months. See [ECF No. 24-5 at 33–34]. Had the school-zone sentence remained, Rudolph would have been required to serve six more months to meet this mandatory sentence before he could have been released. Petitioner claims that Rudolph's drug transaction had, in fact, taken place in a school zone, and the prosecutor committed fraud on the court when he represented that it did not, in violation of Petitioner's due process rights.[8] [ECF No. 28 at 45].

Petitioner's uncle, Benjamin Watkins, a retired assistant city planner, testified at the MNT hearing that Rudolph's crime had actually occurred within a school zone based on a map of school zones he himself had created for the city in the 1980s. [ECF No. 24-10 at 156–76]; see [S.A. Vol. II at 544–48]. The MNT judge found that the distances indicated on this map were drawn by a compass without consulting the relevant drug laws, that the distances were never

---

[8] The Court does not address Petitioner's underlying state law arguments. Estelle, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state law questions.").

confirmed by on-the-ground measurements, and that the map was outdated.  [S.A. Vol. I at 134–35]; see [S.A. Vol. II at 546–48].  The SJC deferred to these factual findings and determined that "[a] prosecutor does not commit 'fraud on the court' by facilitating the government's entry into a plea agreement with a key witness, properly disclosed to the defendant, and permissibly may argue that the witness's testimony is truthful, so long as he does not express a personal belief in the witness's credibility."  Watkins, 41 N.E.3d at 25 (citation omitted).

A federal court performing a habeas review must presume that the state court's findings of fact, including its witness credibility determinations, are correct.  See Sleeper v. Spencer, 510 F.3d 32, 38 (1st Cir. 2007); see also Marshall v. Lonberger, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.").  The petitioner bears the burden of disproving this presumption by clear and convincing evidence.  Sleeper, 510 F.3d at 38 (citing 28 U.S.C. § 2254(e)(1)).  Petitioner argues against the MNT judge's finding that the map was outdated by claiming that it had been current at the time of Benjamin Watkins' retirement and argues that it was unreasonable to determine that this map was not based on field measurements when it was "created by an engineer for the City of New Bedford who testified to its authenticity and accuracy."  [ECF No. 28 at 48].

Neither of these assertions are supported by the record.  Benjamin Watkins himself testified that he created the map in question in 1988, [ECF No. 24-10 at 161], that it had never been updated, [id. at 168, 170], and that he did not know if it had been in use at the time that he retired in 2002, [id. at 162].  He also testified that the map was not based on field measurements but was instead created using a compass on an existing map.  [Id. at 171–75].  Petitioner thus has not shown by clear and convincing evidence that the MNT judge's credibility findings were

erroneous.  Given the required deference to these factual findings, Petitioner's claim that the

SJC's conclusion regarding fraud on the court was contrary to DeChristoforo must fail.

6.    Conflict of Interest

The state prosecutor had formerly served as Petitioner's attorney for a handful of criminal

matters during his time as a public defender in the 1980s.  See [ECF No. 24-9 at 126–30].

Petitioner has argued through each level of his case that this prior representation violated his

attorney-client privilege and unfairly prejudiced his trial.  [S.A. Vol. II at 402–08; S.A. Vol. I at

163–68; ECF No. 28 at 63].  Petitioner's argument is rooted primarily in state law, and he does

not cite any federal precedent that supports his assertion that a prosecutor's conflict of interest

amounts to a due process violation.  See [ECF No. 28 at 64 (citing only state law in support)].

Nor does the Court find that the SJC's decision on this matter is contrary to the standard set forth

in DeChristoforo or based on an unreasonable determination of facts in light of the evidence.

The MNT judge found that the prosecutor's representation of Petitioner was "distant and

fleeting . . . on substantially unrelated matters," [S.A. Vol. I at 168], and the SJC affirmed,

holding that the fact that both matters involved a nine millimeter handgun was not enough of a

connection to make them "substantially related" for the purposes of a conflict of interest,

Watkins, 41 N.E.3d at 24.[9]  The record supports these findings.  The prosecutor testified at the

MNT hearing that he recalled representing Petitioner on a 1989 charge for receipt of stolen

property, but that he could not recall representing him on any of the probation matters discussed

at trial.  [ECF No. 24-9 at 126–31].  Further, although for the sake of transparency he sent

_____

[9] The SJC noted in a footnote: "Although we conclude that there was no actual conflict of
interest in these circumstances, and no potential conflict resulting in any actual prejudice, we
emphasize that the better practice for the prosecutor would have been to avoid the risk of reversal
of a conviction, following a later determination that there was a conflict of interest, by simply
choosing not to prosecute a former client."  Watkins, 41 N.E.3d at 24 n.11.

Petitioner's first attorney a letter explaining that he had previously represented Petitioner, [id. at 137–39], there is no evidence that his prior representation was in any way related to his prosecution of Petitioner. Petitioner has therefore not proven that the SJC's determination that there was no conflict of interest was unreasonable or contrary to DeChristoforo.

Thus, because the Court does not find the SJC's factual findings on any of Petitioner's prosecutorial misconduct claims to be erroneous or its legal conclusions to be an unreasonable application of federal law, Petitioner is not entitled to relief on any of his Ground Two claims.

### C.      Ground Three: Ineffective Assistance of Counsel

For his third ground for relief, Petitioner alleges that the SJC's decisions with respect to his ineffective assistance of counsel claims were contrary to and involved an unreasonable application of Strickland v. Washington, 466 U.S. 668 (1984). [ECF No. 28 at 69]. Petitioner first claims that because his defense counsel had previously represented Rudolph, his representation was limited by an inextricable conflict of interest. [Id. at 70–72]. He additionally argues that his counsel's cross-examination of Rudolph was so ineffective as to render it essentially non-existent, [id. at 73], that his counsel failed to realize or raise potentially exculpatory concerns about the crime scene, [id. at 79], and that he "failed to adequately investigate and interview alibi witnesses," [id. at 80], among numerous other failures, [id. 82–83]. In response to substantially the same claims, the SJC held that "none of the asserted failures shows any inadequacy in trial counsel's performance." Watkins, 41 N.E.3d at 26. Respondent agrees with the SJC and argues that the SJC's decision should be upheld because the court considered these claims under the "substantial likelihood of a miscarriage of justice" standard,

which is more favorable to defendants than <u>Strickland</u>. [ECF No. 38 at 25]; <u>see</u> <u>Gomes</u>, 564 F.3d at 541 n.6; <u>Wright v. Spencer</u>, 447 F.3d 6, 15 (1st Cir. 2006).

      1.   <u>Legal Standard</u>

Inherent in the Sixth Amendment right to counsel is the right to effective assistance of counsel. <u>Missouri v. Frye</u>, 566 U.S. 134, 138 (2012) (citing <u>Strickland</u>, 466 U.S. at 686). Trial counsel is constitutionally ineffective if his or her representation falls below an objective standard of reasonableness and thereby prejudices the defendant. <u>Strickland</u>, 466 U.S. at 688, 693. To show prejudice, a Petitioner must show that "but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different." <u>Sleeper</u>, 510 F.3d at 39. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id</u>. (citing <u>Strickland</u>, 466 U.S. at 694). There is a strong presumption that counsel's representation was reasonable, and great deference is given to their strategic trial decisions. <u>Strickland</u>, 466 U.S. at 689–90. A petitioner claiming ineffective assistance of counsel as a ground for habeas relief "bears a doubly heavy burden," because they must contend with both the deferential <u>Strickland</u> standard and the deferential standard required by Section 2254. <u>Yeboah-Sefah</u>, 556 F.3d at 70.

With respect to conflicts of interest, "[a] defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." <u>United States v. Soldevila-Lopez</u>, 17 F.3d 480, 486 (1st Cir. 1994) (quoting <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 348 (1980)). When a conflict of interest "so affront[s] the right to effective assistance of counsel as to constitute a *per se* violation of the Sixth Amendment," a defendant is not required to prove prejudice. <u>Id</u>. (citing <u>United States v. Aiello</u>, 900 F.2d 528, 531 (2d Cir. 1990)). To show an actual conflict of interest, a habeas petitioner "must demonstrate that '(1)

the lawyer could have pursued a plausible alternative defense strategy or tactic and (2) the alternative strategy or tactic was inherently in conflict or not undertaken due to the attorney's other interests or loyalties . . . ." Deering v. United States, 219 F. Supp. 3d 283, 290 (D.P.R. 2016) (quoting Soldevila-Lopez, 17 F.3d at 486). In other words, a petitioner must prove that the conflict of interest diminished their counsel's ability to vigorously advocate on their behalf. See Cuyler, 446 U.S. at 348–49 (finding actual conflict of interest when an attorney represented co-defendants in a criminal matter with adverse interests).

2.    Conflict of Interest

Petitioner's trial counsel acted as the defense attorney for Rudolph in a 1988 assault and battery and malicious destruction case. [S.A. Vol. I at 124–25]. The MNT judge found that Petitioner's counsel was not aware at the start of the trial that he had previously represented Rudolph and only became aware when reviewing Rudolph's criminal history during a trial recess. [S.A. Vol. I at 124]. The MNT judge further found that the attorney immediately disclosed this information to Petitioner and that Petitioner made no objections. [S.A. Vol. I at 124]. The MNT judge, deciding this issue based on state law, found that the facts did not establish an actual conflict of interest and determined that "[a]t most, this is a case of successive representation involving a potential conflict of interest." [S.A. Vol. I at 169–70].

The MNT judge's findings are supported by the record, and its conclusions are reasonable determinations of fact in light of the evidence.[10]  Because Petitioner raised no objection to this successive representation at trial, he is required to prove an actual conflict of

_____

[10] Petitioner raises both state and federal conflict of interest concerns pertaining to his trial counsel's prior representation of Rudolph. [ECF No. 28 at 69–79]. This Court addresses only the question of ineffective assistance of counsel under federal law. See Estelle, 502 U.S. at 67–68.

interest.  Soldevila-Lopez, 17 F.3d at 486 (quoting Cuyler, 446 U.S. at 348).  Petitioner argues that there was an actual conflict of interest because his lawyer's "loyalties were divided," which prevented him from "vigorously" cross-examining Rudolph.  [ECF No. 28 at 72].  Petitioner, however, is not able to demonstrate that his attorney had a loyalty to Rudolph, or that his prior representation of Rudolph prevented him from seeking alternative defense strategies.  See Deering, 219 F. Supp. 3d at 290.  The Court does not agree that Petitioner's cross-examination of Rudolph was inadequate, as discussed infra.  Because Petitioner cannot prove an actual conflict of interest, this ineffective assistance of counsel claim must fail.

        3.        Cross-Examination of Rudolph

Petitioner next claims that his trial attorney was constitutionally ineffective because he inadequately cross-examined Rudolph.  [ECF No. 28 at 73].  The SJC applied a "stringent standard of review" to this claim and affirmed the MNT judge's ruling that the cross-examination of Rudolph was "vigorous and effective."  Watkins, 41 N.E.3d at 26–27.  Petitioner argues that this determination was objectively unreasonable because evidence suggests that his attorney inadequately implemented his chosen cross-examination strategy and failed to pursue "multiple obviously powerful forms of impeachment."  [ECF No. 28 at 73].

For example, Petitioner argues that it was unreasonable to determine that his trial counsel made a "strategic decision to focus on other methods of impeachment," Watkins, 41 N.E.3d at 27, because his counsel "completely failed" to pursue these stated impeachment methods, [ECF No. 28 at 74].  Petitioner claims that after his counsel cross-examined Rudolph, the "jury knew nothing about" his agreement with the Commonwealth to testify against Petitioner in exchange for his own release, [ECF No. 28 at 74], but this assertion is contrary to the factual record of the case.  The circumstances of Rudolph's cooperation with the Commonwealth were extensively

disclosed to the jury on direct examination.  [ECF No. 38 at 28; ECF No. 24-5 at 32–36].

Rudolph informed the jury that he was serving a mandatory minimum sentence, [ECF No. 24-5 at 33–34], that he was only eighteen months into that sentence, [id. at 34], and that he expected to be released from that sentence after testifying against Petitioner, [id. at 36].  In addition, Petitioner's trial attorney raised the subject of Rudolph's cooperation during cross-examination, [id. at 130], again during re-cross, [id. at 149], and again during his closing argument, [ECF No. 24-7 at 67].

Petitioner also argues that the strategic decision to pursue a particular cross-examination strategy should not have barred his trial attorney from also seeking other viable cross-examination methods when the methods were not mutually exclusive.  [ECF No. 28 at 74].  The MNT judge and the SJC held that the decision of Petitioner's counsel to forego eliciting testimony about Rudolph's drug use or criminal history in favor of other "more powerful grounds of impeachment was not manifestly unreasonable," and this Court agrees.  Watkins, 41 N.E.3d at 27.  In support of this determination, the SJC noted that there was no evidence to suggest that Rudolph had been on drugs on the night in question and, given that Rudolph admitted on the stand that he was currently incarcerated, further inquiry into his criminal record would not have been so damaging to his credibility as a witness that its exclusion undermines the outcome of his trial.  [Id.].  This determination is objectively reasonable and supported by the record.  Furthermore, the availability of additional, possibly effective methods of cross-examination does not render the chosen strategy ineffective.  See Stephens v. Hall, 294 F.3d 210, 225–26 (1st Cir. 2002) (holding that failure to impeach with criminal record did not result in prejudice where alternative methods of cross-examination were available).

Petitioner's argument that his counsel should have elicited testimony from Rudolph about times when he recanted his identification of Petitioner is likewise unavailing. [ECF No. 28 at 75–76]. Petitioner's counsel made a reasonable strategic decision to forego this line of questioning given the trial court's decision on his own motion *in limine* to exclude evidence of threats against Rudolph. [S.A. Vol. II at 485]; see [S.A. Vol. I at 5]. Had Petitioner's counsel asked Rudolph about his wavering identification, the Commonwealth would have been free to respond with evidence that someone close to Petitioner had threatened Rudolph to intimidate him into not testifying. [S.A. Vol. II at 485]; see [S.A. Vol. I at 5]. The decision to forego a line of questioning in order to prevent the Commonwealth from introducing potentially damaging evidence was "clearly a tactical decision that 'falls within the wide range of reasonable professional assistance . . . which might be considered sound trial strategy.'" Cohen v. United States, 996 F. Supp. 110, 116 (D. Mass. 1998) (quoting Strickland, 466 U.S. at 689). The SJC's holding with respect to all aspects of the cross-examination of Rudolph is supported by the record and not an unreasonable application of federal law.

4. Crime Scene Evidence

Petitioner again raises questions about the truthfulness of Rudolph's testimony in connection with his assertion that his defense counsel should have introduced more evidence to contradict Rudolph's statement about the precise location of the victim's Honda Accord at the time of the shooting. [ECF No. 28 at 79–80]. The SJC found that this cumulative evidence "would have added little to support [Petitioner's] vigorous attack on Rudolph's credibility as to the location of the vehicle at the time of shooting." Watkins, 41 N.E.3d at 27. Petitioner argues that this was an "unreasonable determination in light of the fact that the jury believed Rudolph and they convicted" Petitioner despite what he believes was Rudolph's false testimony. [ECF

No. 28 at 80].  Inconsistencies between the testimony of two witnesses do not mean that their testimonies are false, Doherty, 867 F.2d at 70, and a federal habeas court may not "redetermine [the] credibility of witnesses" who testified only at the state court level, Lonberger, 459 U.S. at 434.  Petitioner's argument that this evidence would have been outcome-determinative is not borne out by the record, nor was the SJC's finding that the evidence was cumulative an unreasonable determination of fact.

### 5.    Additional Alibi Witnesses

As an additional Strickland claim, Petitioner asserts that his counsel was constitutionally ineffective when he failed to call as trial witnesses additional alibi witnesses.  [ECF No. 28 at 80].  Failure to call an alibi witness can undermine the outcome of a case, especially when, as in the instant case, eyewitness testimony is the strongest evidence against a defendant.  See Griffin v. Warden, 970 F.2d 1355, 1359 (4th Cir. 1992) ("Eyewitness identification evidence, uncorroborated by a fingerprint, gun, confession, or coconspirator testimony, is a thin thread to shackle a man . . . . Moreover, it is precisely the sort of evidence that an alibi defense refutes best.").  Yet, the SJC reasonably determined that defense counsel did not err in failing to call the potential witnesses because they would not have been "relevant or helpful" to his case.  Watkins, 41 N.E.3d at 27.

Citing Avery v. Prelesnik, 548 F.3d 434, 439 (6th Cir. 2008), Petitioner argues that it was unreasonable for the SJC to rely on the credibility findings of the MNT judge because credibility determinations are the province of the jury.  [ECF No. 28 at 81].  That case in inapposite.  The state court in Avery had attempted to evaluate the credibility of individual witnesses in order to determine if the petitioner had been harmed by his defense counsel's failure to investigate potential witnesses identified to him before the trial.  548 F.3d at 438.  In the instant case, the

relevant inquiry is not whether the remaining witnesses were credible, but whether the attorney's decision not to call them was "manifestly reasonable." [S.A. Vol. I at 178]. The MNT judge found that an investigator for the defense interviewed five potential alibi witnesses before the trial but determined that only one, who was called at trial, had a memory helpful to the case. [Id. at 136–37]. The MNT judge's inquiry into the credibility of these witnesses was proper.

### 6. Remaining Arguments

Petitioner's remaining ineffective assistance of counsel arguments were summarily rejected by the SJC. Watkins, 41 N.E.3d at 28 ("The defendant also challenges numerous 'other defense counsel failings.' As did the motion judge, we conclude that trial counsel's conduct did not result in a substantial likelihood of a miscarriage of justice."). Petitioner's brief restates in bullet point form the same arguments made to the SJC and, without elaborating, claims that they are worthy of reconsideration. Compare [ECF No. 28 at 82–83], with [S.A. Vol. I at 95–96]. The MNT judge's legal rulings on these issues, [S.A. Vol. I at 68–75], were in-depth and supported by the factual record of the case, and the SJC did not act unreasonably by deferring to these findings, see Spencer, 510 F.3d at 38.

Petitioner's defense counsel was not constitutionally ineffective, and the state courts' determinations on this ground were neither unreasonable in light of the evidence nor were they contrary to the clearly established federal law articulated in Strickland v. Washington.

### D. Ground Four: Sufficiency of the Evidence

As the basis for his final ground for relief, Petitioner claims that there was insufficient evidence to support his conviction in contravention of Jackson v. Virginia, 443 U.S. 307 (1979). [ECF No. 28 at 84]. Petitioner challenges the veracity of Rudolph's testimony and argues that a conviction based primarily on this testimony amounted to a denial of Due Process. [Id.].

Respondent in turn contends that the SJC's decision on the question of the sufficiency of the evidence supporting Petitioner's conviction was a reasonable application of Supreme Court precedent.  [ECF No. 38 at 31].

       1.     Legal Standard

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  Under Jackson, a state prisoner is entitled to a writ of habeas corpus if there is insufficient proof to support their conviction.  Jackson, 443 U.S. at 316.  "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  This principle does not bar conviction on the basis of circumstantial evidence alone.  Magraw v. Roden, 743 F.3d 1, 6 (1st Cir. 2014); Stewart v. Coalter, 48 F.3d 610, 614 (1st Cir. 1995).  "Guilt beyond a reasonable doubt cannot be premised on pure conjecture.  But a conjecture consistent with the evidence becomes less and less a conjecture, and moves gradually toward proof, as alternative innocent explanations are discarded or made less likely."  Stewart, 48 F.3d at 615–16.

If a federal court reviewing the decision of a state court encounters a record that "supports conflicting inferences," the court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Jackson, 443 U.S. at 326.  Federal courts performing this review are beholden to a "twice-deferential standard," because they must consider whether the state court's decision was "objectively unreasonable" and whether the jury "could have found the essential elements of the crime beyond a reasonable doubt."  Linton v. Saba, 812 F.3d 112, 123

(1st Cir. 2016) (internal citations omitted).  Jury verdicts are given great deference but are still subject to the same scrutiny and "evidence may sometimes be insufficient to sustain a jury verdict of guilt beyond a reasonable doubt."  O'Laughlin, 568 F.3d at 301.

2.    Analysis

Petitioner contends that the Commonwealth failed to prove all elements of the crime charged because he was convicted primarily on the testimony of Rudolph, which he believes was "literally, physically impossible."  [ECF No. 28 at 84].  Petitioner alleges that "Vern Rudolph[ ] lied, was highly unreliable, was coerced by the police, and was motivated by self-preservation and an immediate 'get-out-of-jail-free card.'"  [Id. at 85].  This argument minimizes the strength of the evidence presented against Petitioner and, as the SJC reasonably determined, "concern[s] the weight and credibility of Rudolph's testimony, which is the province of the jury."  Watkins, 41 N.E.3d at 19.

Although Rudolph was the Commonwealth's primary witness, his testimony was not the only evidence presented.  The SJC found that:

> Three bystanders driving past near the time of the shooting provided descriptions of the shooter and his clothing that were consistent with each other and with the defendant's physical characteristics and the clothing that Rudolph testified the defendant had been wearing. Several witnesses, including the victim's girl friend, were aware that the victim and the defendant had been in an argument and that the defendant wanted to "fight" the victim. The Mark VIII that the defendant had arranged to be registered in a friend's name, and which he drove, matched the description of the vehicle seen at the corner of Mill and Cedar Streets shortly before the shooting, and a Mark VIII, wiped clean of fingerprints and other possible evidence, was located by police early in the investigation. . . .

> In addition, a rational juror could have inferred that the defendant's actions after the shooting indicated consciousness of guilt. The defendant fled from New Bedford to Lynn after the shooting, where he was living under a false name. He offered a false name to police when they first apprehended him in Lynn, and made several seemingly inculpatory statements during the drive in a police cruiser from Lynn to New Bedford, among them that the drive was "going to be the last ride he was going to have for a long time."

<u>Watkins</u>, 41 N.E.3d at 20 (citation omitted).  The SJC's "rational juror" standard of review is the same as the "rational trier of fact" requirement of <u>Jackson</u>, and the SJC's decision under this standard was not objectively unreasonable under 28 U.S.C. § 2254.

Even in the absence of Rudolph's eye-witness identification, a rational trier of fact could have found that there was sufficient evidence, including circumstantial evidence, to find Petitioner guilty beyond a reasonable doubt.  <u>United States v. Brown</u>, 603 F.2d 1022, 1025 (1st Cir. 1979) ("The prosecution may prove its case by circumstantial evidence and it need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt."  (quoting <u>United States v. Gabriner</u>, 571 F.2d 48, 50 (1st Cir. 1978))).

Petitioner presents a version of events that, while plausible, is contrary to the factual determinations made by the state courts and his arguments fail to show that these determinations were unreasonable.  <u>See</u> <u>Torres v. Dennehy</u>, 615 F.3d 1, 5 (1st Cir. 2010) (holding that arguing a different "interpretation of the facts" was insufficient to warrant habeas relief).  Given the required deference to jury findings and the twice-deferential standard of a <u>Jackson</u> review, this Court finds that the evidence was sufficient to convict Petitioner.  The SJC's conclusion regarding the sufficiency of the evidence against Petitioner was not contrary to or an unreasonable application of <u>Jackson</u>, nor was it based on an unreasonable determination of facts in light of the evidence.  Petitioner, therefore, is not entitled to habeas relief on Ground Four.

## IV.      CONCLUSION

For the foregoing reasons, Petitioner's petition for a writ of habeas corpus, [ECF No. 1], is <u>DENIED</u>.  "The district court must issue or deny a certificate of appealability when it enters a

final order adverse to" a habeas petitioner. Rules Governing Section 2254 Cases, R. 11(a). The

Court will grant a certificate of appealability in this instance.

      **SO ORDERED.**

January 7, 2020                                 /s/ Allison D. Burroughs
                                                     ALLISON D. BURROUGHS
                                                     U.S. DISTRICT JUDGE